McKEE, Circuit Judge,
dissenting.
By finding that ACM’s sales of the Citi-corp notes for cash and LIBOR Notes “satisfied each requirement of the contingent installment sales provisions and the ratable basis recovery rule,” Maj. Op. at 246, yet, simultaneously subjecting these transactions to an economic substance and sham transaction analysis, the majority has ignored the plain language of IRC § 1001, and controlling Supreme Court precedent. We have injected the “economic substance” analysis into an inquiry where it does not belong. Therefore, I respectfully dissent.
ACM, like all taxpayers, has the absolute right to decrease or to avoid the payment of taxes so long as that goal is achieved legally. Gregory v. Helvering, 293 U.S. 465, 468, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Id. In Gregory, the taxpayer wanted to transfer stock from her wholly-owned corporation to herself, but realized that a direct distribution of those shares would be a taxable event. Therefore, in an attempt to avoid a taxable event, the taxpayer created a new corporation, transferred the stock to that new corporation, and then caused the new corporation to distribute the stock to her in liquidation. The taxpayer owned all of the stock of United Mortgage Corporation, and that corporation owned 1000 shares of the Monitor Securities Corporation that the taxpayer wanted to obtain. In order to do so without paying the taxes that would clearly be due on a direct transfer, she engineered a purported reorganization of United Mortgage Corporation. The Supreme Court described her scheme as follows:
To that end, she caused the Averill Corporation to be organized under the laws of Delaware on September 18, 1928. Three days later, the United Mortgage Corporation transferred to the Averill Corporation the 1,000 shares of Monitor stock, for which all the shares of the Averill Corporation were issued to the petitioner. On September 24, the Averill Corporation was dissolved, and liquidated by distributing all its assets, namely, the Monitor shares, to the petitioner. No other business was ever transacted, or intended to be transacted, by that company. The petitioner immediately sold the Monitor shares....
Gregory, 293 U.S. at 467, 55 S.Ct. 266 (emphasis added). At the time, 26 U.S.C.A. § 112(g) exempted the gain realized from a corporate reorganization “[i]f there is distributed, in pursuance of a plan of reorganization, to a shareholder, ... stock ... in such corporation.” Id. at 468, 55 S.Ct. 266. Most significantly for our purposes, the Court stated the issue as follows: “[b]ut the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.” Id. at 469, 55 S.Ct. 266. The Court concluded that what was done was not what the statute intended because the liquidation was not a plan of reorganization at all, but “a transfer of assets *264 by one corporation to another in pursuance of a plan having no relation to the business of either_” Id. Accordingly, the Court disregarded the transaction, even though the form of the transaction satisfied the literal requirements of the IRC’s reorganization provisions, because it found that the entire transaction was nothing but “an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else.” Id. at 470, 55 S.Ct. 266. In other words, the transaction was one which “upon its face lies outside the plain intent of the statute.” Id. Consequently, “the rule which excludes from consideration the motive of tax avoidance” did not apply. Id.
Accordingly, I am not as persuaded as my colleagues that Gregory should guide our inquiry into these transactions. Here, the sales of the Citicorp Notes for cash and LIBOR Notes were clearly “legitimate” sales in the nontax sense. Under IRC § 1001, the tax consequences of a gain or loss in the value of property are deferred until the taxpayer realizes the gain or loss. Cottage Savings Assoc. v. Commissioner, 499 U.S. 554, 559, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991). The concept of “realization” is implicit in IRC § 1001(a), Id., and the realized gain is recognized when the property is sold or exchanged. IRC § 1001(c).[1] In Cottage Savings, the Court held that a sale or exchange of property is a realization event “so long as the exchanged properties are ‘materially different’ — that is, so long as they embody legally distinct entitlements.’ Id. at 566, 111 S.Ct. 1503.
Cottage Savings sold 90% participation in 252 mortgages to four S & L’s. It simultaneously purchased 90% participation interests in 305 mortgages held by these S & L’s. All of the loans involved in the transaction were secured by single-family homes....
On its 1980 federal income tax return, Cottage Savings claimed a deduction ... which represented the adjusted difference between the face value of the participation interests that it traded and the fair market value of the participation interests it received. ...
Cottage Savings, 499 U.S. at 557, 111 S.Ct. 1503. It was not disputed that “[t]he ... acknowledged purpose [of the transfers] was to facilitate transactions that would generate tax losses but that would not substantially affect the economic position of the transacting S & L’s”. Id. at 556, 111 S.Ct. 1503. In allowing the taxpayer to deduct the resulting loss the Court reasoned that § 1001 did not recognize exchanges “commonly known as ‘like kind’, and that Congress therefore intended to afford tax recognition of gains and losses resulting from exchanges of property that was materially different.” Id. at 564, 111 S.Ct. 1503. The Court held “[u]nder our interpretation of § 1001(a), an exchange of property gives rise to a realization event so long as the exchanged properties are ‘materially different’ — that is, so long as they embody legally distinct entitlements.” Id. That is what happened here, and I believe that, under Cottage Savings, the tax loss here should have been allowed.
ACM’s sales of the Citicorp Notes for cash and LIBOR Notes resulted in the exchange of materially different property with “legally distinct entitlements.”. Consequently, the sales were substantive dispositions, and the tax effects of those transactions should be recognized. Cottage Savings, as well as the plain language of IRC § 1001, demands that result.
Thus, I do not think that the many cases decided before Cottage Savings that the majority relies upon are helpful, e.g., Maj. Op. at 244-249. Similarly, I do not believe our inquiry is furthered by discussing United States v. Wexler, 31 F.3d 117 (3rd Cir.1994). See Maj. Op. at 253. There, we were not addressing the issue of sham transactions in the context presented here, nor did we cite Cottage Savings. We did cite Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir.1991), and we noted that, in Lerman, we said “ ‘economic substance is a prerequisite to any Code provision allowing deductions.’ ” 31 *265 F.3d at 127 (quoting Lerman, 939 F.2d at 48 & n. 6, 52). However, it is the definition of “economic substance” that is the sticking point. Here, the “economic substance inquiry must be governed by the “material difference requirement” of Cottage Savings, not by the tax' avoidance intent of the taxpayers.
In this regard, I believe the majority mis-characterizes the appellant’s argument. The majority states: “ACM acknowledges that even where the ‘form of the taxpayer’s activities indisputably satisfied] the literal requirements’ of the statutory language, the courts must examine ‘whether the substance of those transactions was consistent with their form’ ”. Maj. Op. at 246 (quoting Appellant’s Br. at 21). However, ACM is referring to the issue as posed by Gregory v. Helvering. In referring to the facts of that case, ACM argues:
The form of the taxpayer’s activities indisputably satisfied the literal requirements of the Code’s reorganization provisions, but the question was whether the substance of those transactions was consistent with their form. As he does here, the Commissioner argued in Crregory that the taxpayer’s ulterior purpose should be disregarded. ...
In other words, the focus should be on the substance of what was done, and not on why it was done. The Supreme Court then analyzed the specific statutory language concerning reorganizations and concluded that the taxpayer’s actions lay outside the plain intent of the statute.
Appellant’s Br. at 21.
As recited earlier, ACM’s sales of the Citi-corp Notes for cash and LIBOR Notes resulted in the exchange of materially different property. I believe our inquiry should proceed no further, and reverse the holding of the Tax Court eliminating the capital gains and losses attributable to ACM’s application of the contingent installment sale provisions and the ratable basis recovery rule to its disposition of the Citicorp Notes.
I can’t help but suspect that the majority’s conclusion to the contrary is, in its essence, something akin to a “smell test.” If the scheme in question smells bad, the intent to avoid taxes defines the result as we do not want the taxpayer to “put one over.” However, the issue clearly is not whether ACM put one over on the Commissioner, or used LIBOR notes to “pull the wool over his eyes.” The issue is whether what ACM did qualifies for the tax treatment it seeks under § 1001. The fact that ACM may have “put one over” in crafting these transactions ought not to influence our inquiry. Our inquiry is cerebral, not visceral. To the extent that the Commissioner is offended by these transactions he should address Congress and/or the rulemaking process, and not the courts.[2]
Accordingly I must dissent from what I admit is a very finely crafted opinion by my colleague, Judge Greenberg.

. IRC § 1001(c) provides: "(c) Recognition of Gain or Loss. — Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property, shall be recognized.”

. As the majority notes, the Commissioner apparently realized the possible “loophole" in the regulations and enacted Treas. Reg. § 1.701-2(a)in an apparent effort to curb such tax driven transactions as the ones here. See Maj. Op. at 246-247, n. 29.